FILED

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

2013 MAY 29 A 9: 04

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 1:13CR 239 |
|---|---|---|
| | ) | |
| | ) | Count 1: 18 U.S.C. § 371 |
| v. | ) | (Conspiracy to Violate of the Anti-Bribery |
| | ) | Provisions of the Foreign Corrupt Practices |
| TOTAL, S.A., | ) | Act) |
| | ) | |
| Defendant. | ) | Count 2: 15 U.S.C. §§ 78m(b)(2)(A), |
| | ) | 78m(b)(5), and 78ff(a) |
| | ) | (Violation of the Books and Records Provision |
| | ) | of the Foreign Corrupt Practices Act) |
| | ) | |
| | ) | Counts 3: 15 U.S.C. §§ 78m(b)(2)(B), |
| | ) | 78m(b)(5), and 78ff(a) |
| | ) | (Violation of the Internal Controls Provision of |
| | ) | the Foreign Corrupt Practices Act) |

## INFORMATION

The United States charges:

### General Allegations

At all times material to this Information, unless otherwise stated:

1. The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1 *et seq.* (hereinafter the "FCPA"), prohibited certain classes of persons and entities from corruptly making payments to foreign government officials to assist in obtaining or retaining business, knowingly falsifying books and records, and knowingly failing to implement adequate internal controls. In relevant part, the FCPA's anti-bribery provisions prohibited any issuer of publicly traded securities registered

pursuant to Section 12(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*l*, or required to file periodic reports with the United States Securities and Exchange Commission ("SEC") under Section 13 of the Securities Exchange Act, 15 U.S.C. § 78(0)d (hereinafter "issuer"), from making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of money, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person. 15 U.S.C. § 78dd-1(a). Pertinent to the charges herein, the FCPA required issuers to make and keep books, records, and accounts that accurately and fairly reflect the transactions and disposition of the company's assets and prohibited the knowing falsification of an issuer's books, records, or accounts. 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), and 78ff(a). The FCPA's accounting provisions also required that issuers maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions were executed in accordance with management's general or specific authorization; (ii) transactions were recorded as necessary to (I) permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) maintain accountability for assets; (iii) access to assets was permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets was compared with the existing assets at reasonable intervals, and appropriate action was taken with respect to any differences. 15 U.S.C. § 78m(b)(2)(B). The FCPA also prohibited the knowing circumvention or failure to implement such a system of internal accounting controls. 15 U.S.C. §§ 78m(b)(5) and 78ff(a).

## Relevant Entities and Individuals

### *The Defendant*

2.  Defendant TOTAL, S.A. ("TOTAL"), was a French corporation headquartered in Nanterre, France. At all relevant times, it was engaged in the business of exploring for and developing oil and gas resources around the world. TOTAL owned a number of subsidiaries that conducted business in the United States. TOTAL's American Depositary Shares were registered with the SEC and traded on the New York Stock Exchange as American Depositary Receipts ("ADRs"). Accordingly, at all relevant times, TOTAL was an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1. Total electronically transmitted its filings to the SEC's Electronic Data Gathering, Analysis, and Retrieval System ("EDGAR") at the Management Office of Information and Technology in Alexandria, Virginia, within the Eastern District of Virginia.

3.  Total International Ltd. ("Total International") was a wholly owned subsidiary of TOTAL registered in Bermuda.

### *Intermediaries*

4.  Intermediary One was an employee of a Swiss private bank who acted at the direction of the Iranian government official described in Paragraph 7.

5.  Intermediary Two was a British Virgin Islands limited liability company that acted at the direction of the Iranian government official described in Paragraph 7.

### *Relevant Iranian Governmental Entities and Officials*

6.  The National Iranian Oil Company ("NIOC") was a government-owned corporation operating under the direction and control of the Ministry of Petroleum of

3

Iran. NIOC was exclusively responsible for the exploration, extraction, transportation and exportation of crude oil, as well as sales of natural gas and liquefied natural gas, and for the award of any contracts procuring an entitlement to natural gas, in Iran. NIOC was an agency and instrumentality of the Government of Iran and its officers and employees were "foreign officials" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

7. The Iranian Official was the Chairman of an Iranian engineering company that was more than 90% owned by the Government of Iran and substantially controlled by the Government of Iran. From at least early 2001, the Iranian Official was the head of an Iranian organization concerned with fuel consumption, which was a wholly owned subsidiary of NIOC, and was a government advisor to a high-ranking Iranian official. The Iranian engineering company and Iranian organization were agencies and instrumentalities of the Government of Iran, and thus the Iranian Official was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

### The Sirri A and E and South Pars Projects

8. The Sirri A and E oil and gas fields were located on or around Sirri Island, an island in the Persian Gulf that was part of Iran. TOTAL sought to re-enter the Iranian oil and gas market by negotiating a contract with NIOC to develop the Sirri A and E oil and gas fields. On or about July 1, 1995, TOTAL entered into such a development contract with NIOC.

9. The South Pars gas field was located in Iranian territorial waters and was part of the world's largest gas field. In 1997, TOTAL began negotiating with NIOC to

develop phases 2 and 3 of the South Pars gas field. On or about September 28, 1997, NIOC entered into a contract with TOTAL granting it a 40% interest in developing phases 2 and 3 of the South Pars gas field.

## COUNT 1

### Conspiracy to Violate the Foreign Corrupt Practices Act
### (18 U.S.C. § 371)

10. Paragraphs 1 through 9 are realleged and incorporated by reference as though fully set forth herein.

11. From at least in or around May 1995 until at least on or about November 29, 2004, in the Eastern District of Virginia and elsewhere, defendant TOTAL did unlawfully, willfully, and knowingly combine, conspire, confederate, and agree with Intermediary One, Intermediary Two, and others, known and unknown, to commit offenses against the United States, that is, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to any foreign officials, and any person while knowing that all or a portion of such money or thing of value would be or had been offered, given, or promised, directly or indirectly, to foreign officials, for purposes of: (i) influencing acts and decisions of such foreign officials in their official capacities; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duties of such officials; (iii) securing an improper advantage; and (iv) inducing such foreign officials to use their influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist TOTAL and others in obtaining and retaining

5

business for and with, and directing business to, TOTAL and others, in violation of Title 15, United States Code, Sections 78dd-1(a)(1) and (a)(3)(B).

## Purpose of the Conspiracy

12. The purpose and object of the conspiracy was to obtain and retain lucrative contracts related to the Sirri A and E and South Pars projects through the promise and payment of tens of millions of dollars in unlawful payments to the Iranian Official and others.

## Manner and Means of the Conspiracy

13. TOTAL and its co-conspirators employed various manner and means to carry out the conspiracy, including but not limited to the following:

    a. TOTAL and its co-conspirators held a meeting with the Iranian Official at which was discussed, among other things, unlawful payments to an intermediary designated by the Iranian Official in order to secure the Iranian Official's support for TOTAL obtaining contracts to develop the Sirri A and E oil fields.

    b. TOTAL and its co-conspirators met with the Iranian Official to discuss entering into a purported consulting agreement with an intermediary designed by the Iranian Official in connection with NIOC granting TOTAL the rights to develop the Sirri A and E oil fields.

    c. TOTAL and its co-conspirators caused Total International to enter into an Umbrella Agreement with Intermediary One, which had no specific terms for payment, or other consideration, but instead provided that the parties would, from time to time, execute Consulting Services Requests, which the parties understood would detail

the amounts of the unlawful payments that TOTAL would pay at the direction of the Iranian Official.

    d. TOTAL and its co-conspirators caused Total International to execute a Consulting Services Request with Intermediary One as a mechanism for TOTAL to pay at the direction of the Iranian Official millions of dollars in unlawful payments to Intermediary One.

    e. In accordance with the Umbrella Agreement and Consulting Services Request, at the direction of the Iranian Official, TOTAL paid approximately $16 million over a two and a half year period to accounts designated by Intermediary One.

    f. To ensure continued unlawful payments in connection with the South Pars project, at the direction of the Iranian Official, TOTAL and Intermediary Two entered into a second consulting agreement and additional amendments to the Umbrella Agreement.

    g. In accordance with these agreements, at the direction of the Iranian Official, TOTAL paid approximately $44 million over a seven year period to accounts designated by Intermediary Two.

    h. TOTAL mischaracterized the payments under the various consulting agreements as "business development expenses," when they were, in fact, unlawful payments for the purpose of inducing the Iranian Official to use his influence in connection with the granting of development rights to the Sirri A and E and South Pars fields, and improperly characterized the unlawful consulting agreements as legitimate consulting agreements.

## Overt Acts

14. In furtherance of the conspiracy and to achieve its purpose and object, at least one of the co-conspirators committed or caused to be committed the following overt acts, among others:

    a. In or about May 1995, TOTAL negotiated with the Iranian Official a purported consulting arrangement pursuant to which TOTAL would make unlawful payments to an intermediary designated by the Iranian Official in connection with NIOC signing a development agreement with TOTAL for the Sirri A and E project.

    b. On or about July 10, 1995, Total International entered into an Umbrella Agreement with Intermediary One to provide a framework for TOTAL to make unlawful payments to the intermediaries designated by the Iranian Official.

    c. On or about July 10, 1995, Total International executed the First Consulting Services Request with Intermediary One under which TOTAL agreed to pay (1) $6 million within forty-five days of the execution by TOTAL of a contract to develop the Sirri A and E oil fields; (2) $500,000 for expenses; (3) a fee of $25 million to be paid in separate quarterly installments as capital expenditures reached specified levels; (4) additional payments equal to 5% of total expenditures above the capital expenditures agreed to in the contract; and (5) a percentage of all sales of oil and gas above a certain price.

    d. On or about July 10, 1995, TOTAL submitted for processing a request for payment in the amount of $500,000 to be transferred to an account at Banque de Financement D'Investissement in Geneva, Switzerland.

   e. On or about July 10, 1995, pursuant to the First Consulting Services Request, Total International wire transferred $500,000 from its account at Banker's Trust in New York, New York, to an account at Banque de Financement D'Investissement in Geneva, Switzerland.

   f. On or about July 13, 1995, TOTAL signed a contract with NIOC granting TOTAL development rights over the Sirri A and E fields.

   g. On or about October 3, 1995, pursuant to the First Consulting Services Request, Total International wire transferred 5,737,510 Swiss francs ("CHF") from its account at Credit Suisse in Zurich, Switzerland, to an account at Banque de Financement D'Investissement in Geneva, Switzerland.

   h. On or about June 6, 1997, Intermediary Two was formed in the British Virgin Islands.

   i. On or about June 12, 1997, Total International entered into a letter agreement with Intermediary One to amend the First Consulting Services Request to provide for an accelerated payment of approximately $10 million from TOTAL.

   j. On or about June 13, 1997, Intermediary One transferred the Umbrella Agreement to Intermediary Two at the direction of the Iranian Official.

   k. On or about July 11, 1997, pursuant to the First Consulting Services Request, Total International wire transferred CHF 4,389,010 from its account at Credit Suisse in Zurich, Switzerland, to an account at Lombard Odier in Geneva, Switzerland.

    l.    On or about July 13, 1997, Total International entered into an Assignment Agreement, which assigned Intermediary One's interests in the other consulting agreements to Intermediary Two.

    m.    On or about July 14, 1997, at the direction of the Iranian Official, Total International and Intermediary Two executed the Second Consulting Services Request under which TOTAL agreed to pay (1) $10 million within 90 days; (2) a fee of $30 million to be paid in separate quarterly installments as capital expenditures reached specified levels; (3) a consulting fee equal to the greater of (i) 4% of total capital expenditures above the capital expenditures provided in the development contract, or (ii) $60 million; and (4) an additional $10 million lump sum payment.

    n.    On or about September 28, 1997, TOTAL executed a contract with NIOC granting TOTAL a 40% interest in developing phases 2 and 3 of the South Pars gas field.

    o.    On or about December 12, 1997, pursuant to the First Consulting Services Request, Total International wire transferred CHF 5,814,413 from its account at Credit Suisse in Zurich, Switzerland, to an account at Lombard Odier in Geneva, Switzerland.

    p.    On or about August 28, 1998, TOTAL approved a payment in the amount of CHF 3,952,500 to be transferred to an account at Credit Suisse in Geneva, Switzerland.

    q.    On or about September 1, 1998, pursuant to the Second Consulting Services Request, TOTAL wire transferred CHF 3,952,500 from its account at Credit Suisse in Zurich, Switzerland, to an account at Credit Suisse in Geneva, Switzerland.

r. On or about June 9, 1999, pursuant to the Second Consulting Services Request, TOTAL wire transferred CHF 1,790,043 from its account at Credit Suisse in Zurich, Switzerland, to an account at Credit Suisse in Geneva, Switzerland.

s. On or about March 17, 2003, pursuant to the Second Consulting Services Request, TOTAL wire transferred CHF 8,783,396 from its account at Credit Suisse in Zurich, Switzerland, to an account at Credit Suisse in Geneva, Switzerland.

t. On or about November 29, 2004, pursuant to the Second Consulting Services Request, TOTAL wire transferred CHF 6,616,057 from its account at Societe General in Paris, France, to an account at Credit Suisse in Singapore.

u. Between on or about July 10, 1995, and on or about November 29, 2004, at the direction of the Iranian Official, Total made approximately $60 million in unlawful payments under the agreements to intermediaries for the purpose of inducing the Iranian Official to use his influence in connection with Total's efforts to obtain and retain business related to the Sirri A and E and South Pars projects.

(All in violation of Title 18, United States Code, Section 371.)

12

## COUNT 2

### FCPA – Books and Records
### (15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), 78ff(a))

15. Paragraphs 1 through 9 and 12 through 14 are realleged and incorporated by reference as though fully set forth herein.

16. From in or around 1995 to in or around 2004, in the Eastern District of Virginia and elsewhere, defendant TOTAL knowingly falsified and caused to be falsified books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of TOTAL, to wit: TOTAL (a) mischaracterized the unlawful payments under the various consulting agreements as "business development expenses" and (b) improperly characterized the unlawful consulting agreements as legitimate consulting agreements.

(All in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), and 78ff(a).)

## COUNT 3

## FCPA – Internal Controls
## (15 U.S.C. §§ 78m(b)(2)(B), 78m(b)(5), 78ff(a))

17. Paragraphs 1 through 9 and 12 through 14 are realleged and incorporated by reference as though fully set forth herein.

18. From in or around 1995 to in or around 2004, in the Eastern District of Virginia and elsewhere, defendant TOTAL knowingly circumvented and knowingly failed to implement a system of internal accounting controls sufficient to provide reasonable assurances that transactions and dispositions of TOTAL's assets complied with applicable law, including the FCPA, to wit: TOTAL (a) failed to implement adequate anti-bribery compliance policies and procedures; (b) failed to maintain an adequate system for the selection and approval of consultants; (c) failed to conduct adequate audits of payments to purported consultants; (d) failed to establish a sufficiently empowered and competent corporate compliance office; (e) failed to take reasonable steps to ensure the company's compliance and ethics program was followed; (f) failed to evaluate regularly the effectiveness of the company's compliance and ethics program; (g) failed to provide appropriate incentives to perform in accordance with the compliance and ethics program; (h) concealed the consulting agreements' true nature and true participants; (i) performed no due diligence concerning the named or unnamed parties to

13

these agreements; and (j) lacked controls sufficient to provide reasonable assurances that the consulting agreements complied with applicable laws.

(All in violation of Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5), and 78ff(a).)

|  |  |
|---|---|
| Neil H. MacBride<br>United States Attorney | Jeffrey H. Knox<br>Chief, Fraud Section<br>Criminal Division<br>U.S. Department of Justice |
| By: *Charles Connolly*<br>Charles F. Connolly<br>Assistant U.S. Attorney | By: *A. Gentin*<br>Andrew Gentin<br>Trial Attorney |